**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ROMEO LISTER, *et al*., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-11-0108 |
| | § | |
| NATIONAL OILWELL VARCO, L.P., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

This is an employment-discrimination suit.  Romeo Lister and Terrance Williams, both

African-American, sued their former employer National Oil Well Varco, L.P. (NOV), alleging that

they were subject to racial discrimination, a racially hostile work environment, and retaliation. While

they were employed at NOV, both men filed EEOC complaints, and Lister later filed suit.  Both

allege that they received reprimands or other discipline after engaging in these protected activities.

Both also allege that NOV fired them because of retaliation as well as discrimination, although

Williams continued to work at NOV for over six months after filing his EEOC complaint, and Lister

continued to work for over two years after filing his complaint and over one year after filing his

lawsuit.  Both plaintiffs assert violations of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et

seq*.; 42 U.S.C. § 1981; and the Texas Commission on Human Rights Act (TCHRA), TEX. LAB.

CODE § 21.051.  Lister, who took Federal Medical Leave Act (FMLA) leave for over 16 weeks in

2011 and was fired two weeks after he returned from medical leave, also asserted interference and

retaliation claims under the FMLA, 29 U.S.C. § 2601, *et seq.*[1]

---

[1] Claims by a third plaintiff, Jerry Wilson, were dismissed in a previous order.  (Docket Entry No. 50).

NOV moved for summary judgment on all the plaintiffs' claims, (Docket Entry No. 69). The plaintiffs responded, (Docket Entry Nos. 75 & 76); the defendants replied, (Docket Entry No. 82); and the plaintiffs surreplied, (Docket Entry No. 84). NOV objected to certain evidence the plaintiffs submitted in opposing the summary-judgment motion, (Docket Entry No. 78), and the plaintiffs responded to those objections, (Docket Entry No. 83).

Based on the pleadings; the motions, responses, and replies; the record; and the relevant law, this court grants NOV's motion for summary judgment and enters final judgment by separate order.[2] The reasons for these rulings are explained in detail below.

## I.    Background

The parties have submitted extensive summary-judgment evidence. The exhibits include testimony from the depositions and declarations of Williams and Lister; the deposition of Julia McHugh, the Human Resources manager at the NOV Sugar Land facility, where both Lister and Williams worked; the deposition of Edwin (Butch) Smerek, Williams's manager at the NOV Sugar Land facility; the deposition of Stephen Long, the Operations Director for NOV Sugar Land; the deposition and declaration of  Stephanie Wade, the Health, Safety, and Environment manager at NOV; the deposition of Reynaldo Pena, a manufacturing supervisor at NOV Sugar Land and the day-shift supervisor when Lister and Williams were night-shift supervisors; and the deposition of Stacey Winter, a manager at NOV Sugar Land. The parties also attached documents, including emails.  The objections to the submitted summary-judgment evidence are discussed below.

### A.    Terrance Williams

---

[2]  NOV had also filed a motion to dismiss some of Lister's claims.  (Docket Entry No. 55).  The summary-judgment motion makes NOV's motion to dismiss moot.

Williams worked as a night-shift supervisor at NOV's Sugar Land plant from October 2007 until March 2010, when he was fired.  Williams applied for the night-supervisor position that he was hired to fill.  He supervised several departments, including a weld shop, mud pump production, a paint booth, and a machine shop.  When he was hired, there was one other night-shift supervisor, John Jordan.  Another night-shift supervisor, Mike Brobiak, began working around the same time.  Jordan and Brobiak are both Caucasian.  Williams's direct supervisor was Steve Long, the Sugar Land plant manager, who was also Caucasian and who hired Williams.

Williams testified that when he began working in October 2007, there were problems with night-shift employees not working, sleeping, and leaving the property.  There was suspected drug trafficking and other criminal activity in the facility. (Docket Entry No. 69, Ex. 1 at 101–04; No. 75, Ex. E at 15–17).  Williams was responsible for walking through the plant parking lot, where the concern about crime was high.  (Docket Entry No. 75, Ex. E at 16-17).  At one point, drug-sniffing dogs were brought to the plant, and there were several drug-related arrests.  (Docket Entry No. 75, Ex. E at 15–17).  Williams testified that one reason that he was hired was to act as "Black intimidation" to control NOV's drug and violence problems.  (Docket Entry No. 75, Ex. A).  NOV disputes this characterization, pointing to Williams's own description of his job as involving a "lot of responsibility," including learning the product; knowing where things were properly located and who was in charge of obtaining various parts; making sure the parts got to the paint department, the floor, and the test stand; managing time; monitoring attendance; responding to medical problems that might arise; keeping time; ensuring punctuality; scheduling holiday work; and patrolling the facility, including the parking lot.  (Docket Entry No. 69, Ex. 1 at 91; No. 75, Ex. E at 16–17).

Williams stated in a declaration that NOV failed to provide him with adequate training for his night-supervisor position.  (Docket Entry No. 75, Ex. A).  Williams testified at his deposition that he received on-the-job training from John Jordan, the other night-shift supervisor, who answered his questions and taught him the "[d]os and don'ts, hard-workers, and not-so-hard workers." (Docket Entry No. 69, Ex. 1 at 100–01).

Williams testified that from the time he became a night-shift supervisor in October 2007, unlike other nonblack supervisors, he was required to use or share the office and computer of Leon Watson, a black day-shift supervisor.  Williams testified that the other night-shift supervisor, John Jordan, who is white, had his own office space, computer, and phone.  (Docket No. 69, Ex. 1 at 107–08, 113–16).  A new supervisor, also not African-American, was later hired and assigned an office.  (Docket Entry No. 75, Ex. 13).  Williams testified that he was also denied access to filing cabinets for storing personal items and information of the employees he supervised.  When he asked for a filing cabinet, he was instead provided a folder tacked to a wall.  Williams testified that he was not provided access to surveillance cameras even though his responsibilities included plant security. Unlike other nonblack supervisors, he was not given the security code to the main office.  (Docket Entry No. 75, Ex. A).  Williams claimed that he was not allowed to order tools like other supervisors, (Docket Entry No. 69, Ex. 1 at 97), and was not informed of supervisory meetings. (Docket Entry No. 75, Ex. A).  NOV disputes these claims and points out that Williams made no internal complaint about any of these issues.  NOV also points out that Williams admitted that he had an office that he could work in privately and that when Williams asked for additional space next to that office, NOV declined the request because the space had plumbing in it and sewage underneath that made it inappropriate for an office.  (Docket Entry No. 69, Ex. 1, at 116, 117, 199).

NOV also points to testimony by Williams that he had a telephone, computer, and a key-fob that allowed him access to the facility.  (*Id*. at 116, 187).

Williams alleged several other discriminatory acts.  On August 18, 2008, he received an email from his manager, Steve Long, about a rumor that Williams had sex in his office with a female employee.  In the email, Long wrote that he had "absolutely no reason to believe these reports" but that Williams should be careful because "appearances are just as important as reality."  He advised Williams to leave the door open when female employees were in his office.  (Docket Entry No. 69, Ex. 1 at 23; No. 75, Ex. 19).  NOV disputes Williams's characterization, pointing out that this single incident was not any kind of accusation, but rather the manager's instruction to avoid the appearance of impropriety that could result from meeting with women in the office with the door closed. (Docket Entry No. 69, p. 24).

 Williams stated in his declaration that a white NOV warehouse employee told another employee that he wanted to put Williams in chains, tie him to his truck bumper, and drag him down the street.  An employee who heard the comment reported it to Williams and gave a statement to the Human Resources Department.  A meeting was held with Williams, Human Resources department employees, Steve Long, and John Jordan.  After the meeting, a report was prepared and the white employee was disciplined by having to spend thirty days working on the day shift.  (Docket Entry No. 75, Exs. A & 13).

In 2009, an NOV guard told Williams that a fired white night-shift employee went to the guard gate and asked for Williams.  The former employee had a shotgun in his car and said that he was going to "get" Williams.  A report was filed with NOV's Human Resources Department.

Williams asserts that NOV did not investigate this report.  (Docket Entry No. 69, Ex. 1 at 210–11; No. 75, Ex. A).

On August 10, 2009, Williams filed a discrimination complaint with the EEOC and the Texas Workforce Commission (TWC).  (Docket Entry No. 75, Ex. 13).  Williams stated in his declaration that Long told him that if he dropped his EEOC complaint, he could have a job anywhere in the company, but that if Williams did not drop the EEOC charge, he could not guarantee that a job would be held for him at NOV.  (Docket Entry No. 75, Ex. A at 1).

Williams also testified that on September 14, 2009, he was reprimanded for various work issues.  Williams met with management and received a report addressing those issues, including reports that he had been leaving early.  (Docket Entry No. 75, Ex. 15).  Williams testified that he was reprimanded on February 18, 2010 for having transferred Cleve Scott in August 2009.  According to Williams, Scott's transfer was approved before Williams filed the EEOC charge, but later resurrected as the basis for a reprimand.  Williams was also reprimanded for his earlier decision to transfer employee Akeem Alsadan.  (Docket Entry No. 75, Exs. A & 22; No. 76, Exs. 39 & 40).  NOV disputes Williams's description of these events.  NOV points to documents that Williams cited and noted that these documents do not support his claims.  Instead they show that Cleve Scott was transferred twice, once in 2009 and once in 2010, and that as Julie McHugh testified, there was no problem with the 2009 transfer, as Williams asserted.  The 2010 transfer did present an issue, but NOV points to evidence showing that Williams was not reprimanded or otherwise disciplined for this transfer.  (Docket Entry No. 82 at 13).  Similarly, the document Williams cited to support his allegation about the reprimand following the transfer of Akeem Alsadan is a document about the

employee's request for a transfer in February 2010. The document does not reflect any reprimand of Williams for an earlier transfer decision. (*Id.*).

Williams contends that he was fired after a third incident when Randy Hrnicko, who Williams supervised on the night shift, asked the day-shift supervisor about his pay. (Docket Entry No. 75, Exs. A & 20). NOV disputes that this was the reason why Williams was fired. NOV again points out that Williams cites documents that do not reflect any reprimand for any incident involving Randy Hrniko. (Docket Entry No. 82 at 13). NOV also points out that Steve Long testified that this was not the offense for which Williams was fired and that Williams is simply incorrect in asserting that Long changed that testimony. (*Id.*).

NOV asserts that Williams was fired several weeks later, in February 2010. NOV fired Williams after receiving complaints from several of his direct reports stating that Williams was threatening them. Alex Freeman, one of those reports, went to McHugh, NOV's Human Resources manager, and stated that Williams had threatened to fight him, fire him, and "bring the hot water," which Freeman took as a threat to shoot him. Freeman told McHugh that he feared for his job and safety. Freeman also reported that Williams was targeting two other employees, Genaro Torres and Tekle Kassaye. NOV investigated. All three employees confirmed that Williams had threatened their jobs and physical safety. NOV's records state that in March 2010, Williams was fired for a "violation of [company] harassment policy, creating hostile work environment & behavior unacceptable as a superior." (Docket Entry No. 69, Ex. 1 at 24; Ex. 3 at 9–27).

After Williams was fired, he was indicted by the Fort Bend County District Attorney for food-stamp fraud. Williams has submitted notes from the District Attorney's office stating, "$6287 food stamps. Under reported his income. @ National Oilwell Varco. Getting food stamps at one

pt while making 8320/mo. 99,000. 9/08-8/09." (Docket Entry No. 75, Ex. A at 5). Williams stated

that he believes NOV reported that his income was $90,000 even though he had not earned that

much. The criminal charges were later dismissed, but Williams testified that they caused him to lose

another job for which he had been hired after leaving NOV. (Docket Entry No. 75, Ex. A). NOV

disputes Williams's assertion, pointing out that Williams did not submit evidence of what NOV in

fact reported to the State of Texas. NOV has provided summary-judgment evidence that the

earnings NOV reported for Williams were accurate. (Docket Entry No. 82 at 15; Ex. 18).

Williams filed this suit eight months later.

### B.   Romeo Lister

Romeo Lister was hired to work as a welder at NOV's Sugar Land plant in June 2008. He

was initially hired through a temporary-worker employment agency. NOV hired him as a full-time

employee in August 2008. In November 2008, NOV promoted Lister to be a night-shift supervisor.

(Docket Entry No. 69, Ex. 5 at 110; No. 75, Ex. B at 1). Like Williams, Lister contends that he was

undertrained as a supervisor and instead was intended to serve as a security guard to respond to the

drug-trafficking and crime problems on the night shift. For the first few months on the job, Lister's

responsibilities included patrolling NOV's parking lot. Lister contends that, like Williams, he was

hired to provide "black intimidation" on the night shift. NOV again disputes this characterization,

pointing out that Lister testified that he had years of responsibility in supervisory work before

joining NOV and that his night-shift supervisor duties included a wide range of responsibilities,

including "scheduling work orders, scheduling vacation days, sick days, filling out any paperwork

on any employees getting injured, to make sure everyone worked safe and to make sure that the —

these employees were not using their phones while they were working unless they were on break."
(Docket Entry No. 69, Ex. 5 at 110–11).

Lister testified that he was treated differently from nonblack employees in several ways.  He
stated that he was never provided appropriate training.  (Docket Entry No. 69, Ex. 5 at 87, 111–14).
He did, however, receive assistance from Williams, who was a more experienced supervisor.  Lister
testified that he was not provided access to security cameras or the security code to the Sugar Land
plant's main office.  (Docket Entry No. 75, Ex. B).  Lister testified that he and Williams were the
only supervisors not allowed to order tools or to attend certain supervisory meetings.  Lister was
required to share an office and a computer, while other nonblack supervisors were given their own
offices and computers.  One of the employees who Lister shared an office with was a white day-shift
supervisor.  (Docket Entry No. 69, Ex. 1 at 201).  Around July 2009, Lister told Misty Moore, who
worked in NOV's Human Resources Department, that he did not have an office.  (Docket Entry No.
75, Ex. 14).

NOV disputes these statements.  NOV points to Lister's testimony that he had four offices
for use during his employment as a night-shift supervisor and, when he became a day-shift
supervisor, was assigned his own office.  (Docket Entry No. 69, Ex. 5 at 259).  NOV also points to
Lister's testimony that he had an access card to the facility and access to the doors for every office
and department that he had supervisory responsibility for.  (*Id*. at 256.)

Lister testified that he observed two instances of allegedly discriminatory comments by his
manager, Steve Long.  He stated that Long once told him to "walk with my White supervisor and
not with my Black supervisor, Williams, 'because black supervisors act like they own the
company.'"  (Docket Entry No. 75, Ex. B).  Williams testified that Long said in a meeting, at which

Lister was also present, that black workers were too "tribal" to represent NOV on trips abroad. (Docket Entry No. 69, Ex. 1 at 107–08). Julia McHugh, NOV's Human Resources manager, and Amy Krafoik, who worked in employee development, were both present at the meeting. McHugh did not investigate, and Long was not disciplined. (Docket Entry No. 75, Ex. E at 22 & Ex. F at 39). Long acknowledged referring to the "tribal" background of Bewketu Tassew, an employee who had recently immigrated to the United States from Ethiopia. Long denied that his use of "tribal" was a racial slur and stated that he was referring to cultural rather than racial qualities. Long stated that he was explaining that Tassew might feel more comfortable with a "more formal" management style than Williams and Lister were providing. (Docket Entry No. 69, Ex. 2 at 21–22). NOV asserts that no inference of racial discrimination can be drawn from this incident.

On August 10, 2009, Lister, like Williams, filed a discrimination charge with the EEOC and the TWC. Lister asserted that he had been discriminated against by NOV on the basis of his race and color. (Docket Entry No. 75, Ex. 14). After Lister's charge was filed, his car was scratched while it was in NOV's parking lot. (Docket Entry No. 75, Ex. B at 5). When Lister reported this to Long and to the police, he was allowed to park in a monitored area. (Docket Entry No. 75, Exs. 37 at 2; E at 100).

Lister also alleges that NOV employees treated him differently after he filed his EEOC charge. He alleges that he was excluded from certain meetings and that some coworkers stopped talking to him. Lister alleges that one employee asked him if he carried a tape recorder with him and another started calling him "trouble." (Docket Entry No. 69, Ex. 6 at 281–3). Lister does not state whether he reported these incidents to NOV.

10

On September 14, 2009, Lister was required to attend a meeting with Long, the plant manager; Butch Smerek, Lister's manager; and McHugh, the HR manager.  Among the topics discussed were reports that Lister had been leaving work early without notifying department leads, the need for Lister to maintain credibility and increase communication with his employees, the shift in parking-lot patrol responsibilities to a security company and away from supervisors, the need to build better relationships with certain NOV employees, and the need for further efforts in learning how to use the new computer system.  The notes also state that "Romeo's strength is his presence and ability to relate well with those in fabrication."  (Docket Entry No. 75, Exs. B and 16).

On October 23, 2009, Lister sent an email to Long requesting an advance on his salary. (Docket Entry No. 75, Ex. B; No. 76, Ex. 41).  On October 26, Long sent an email to all employees stating that because requests for advances had become too frequent, "[a]s of today's date NOV Sugar Land will not give any future pay advances or loans.  (Docket Entry No. 76, Ex. 42).  NOV points out that the denial of the pay loan is not evidence of racial discrimination because other African-Americans employees had received such loans in the past and the decision to end the practice applied to all employees.  (Docket Entry No. 69 at 15).

In early 2010, Lister's position was eliminated due to downsizing.  Both Lister and the other night-shift operator then working, John Jordan, became day-shift operators.  Lister kept the same salary when he transferred.  In May 2010, Lister received a 3% salary increase.  In May 2011, Lister received a 5% salary increase.  (Docket Entry No. 69, Ex. 4 at 38, 59; Ex. 12).

On July 15, 2011, Lister saw Dr. Andy Shen and complained that he was under stress at work.  Dr. Shen found elevated blood pressure and heart rate and diagnosed anxiety.  (Docket Entry No. 75, Ex. C at 19, 72, & 76)  Lister took FMLA leave from work from July 13, 2011 to September

22, 2011, when he returned briefly.  He took FMLA leave again from September 29, 2011 until November 15, 2011.  He alleges that this extended leave was due to "physical problems stemming from the workplace discrimination and environment including anxiety, stress, vomiting and hypertension." (Docket Entry No. 69, Ex. 9, ¶6; No. 75, Ex. B at 5; Exs. 25 & 37).  It is undisputed that NOV gave Lister over 16 weeks of FMLA leave.

On November 19, 2011, one of the employees under Lister's supervision, James Kelly, reported that he was injured at work when a hot shaving struck him in the face.  Kelly, who is African-American, reported the injury to Felton Houston, a lead man in a different department. (Docket Entry No. 69, Ex. 7 at 20; No. 75, Ex. F at 102).  Lister had recently returned to work from FMLA leave but was off work on the day of the injury.  (Docket Entry No. 75, Ex. B at 3).  Tassew, who was working as a lead man in Lister's department, was also not working on that date.  (Docket Entry No. 69, Ex. 4 at 152; Ex. 6 at 455).  Kelly did not seek medical care until November 28, a day when Lister was at work.  According to the evidence in the record, Kelly's injury had worsened and appeared infected.  Once Kelly sought medical care, his injury became "recordable" under Directive 007, NOV's incident-reporting and investigation process.  (Docket Entry No. 69, Ex. 7 at 25–26; Ex. 8).

The Directive 007 procedure consists of 5 steps.  "Step 1: Incident Report," is notification of the injury; "Step 2: Incident Notification Meeting," is a notification to the facility managers and supervisors; "Step 3: Incident Investigation/Root Case," is the investigation phase in which members of management conduct an investigation and determine the incident's cause; "Step 4: Incident Review Board," involves notification of the root cause and what disciplinary, corrective, and preventative actions will be taken; and "Step 5: Incident Learning," includes the processing and

notification of the investigation results.  (Docket Entry No. 69, Ex. 8, ¶9).  The "Step 1" instructions state:  "This form . . . MUST be completed **within 24 hours** of the incident . . . .  **The supervisor is to collect data and provide it to HSE**." and "Supervisor is to fill this form.  HSE is to verify the accuracy."  (*Id*. at 8 (emphasis in original)).  The Step 2 instructions provide, "This part MUST be completed within **24 hours** of the incident.  The supervisor is to complete this form.  When possible, injured employee needs to be present," and that, "The supervisor where the incident occurred is responsible for organizing the Incident Notification Meeting."  (*Id*. at 12 (emphasis in original)).  The Step 2 instructions also state that "Sections 2 through 6 are required to be filled out by the supervisor in the department where the incident occurred, **prior** to the meeting.  Then, a meeting must be called to distribute this notification."  (*Id*. at 12 (emphasis in original)).

On November 28, Wade emailed Lister and Tassew telling them about the incident and stating that the Step 1 incident-report form had to be completed.  No form was completed.  Wade sent a follow-up email to Lister and to Tassew about the report.  (Docket Entry No. 69, Ex. 7 at 26–28).  On November 29, Wade emailed McHugh, stating that "[d]uring [l]ead man training the leads were instructed to complete the incident report if the incident occurred while they were providing supervision or if they had first knowledge of the incident.  In this case the injury was reported to [Tassew] so I asked him to complete the report.  When I did not receive the report I escalated the request to Romeo and then to Butch . . . ."  (Docket Entry No. 76, Ex. 32).  Lister testified that he was not aware of this email until after he was fired.  (Docket Entry No. 69, Ex. 6 at 453–54).

It is undisputed that Directive 007 states that the supervisor has the responsibility to complete the form, as well as the other steps set out in Directive 007.  Wade stated in an affidavit that it is the

13

responsibility of the injured employee's supervisor to complete all the necessary steps in Directive 007. (Docket Entry No. 69, Ex. 8, ¶10). Wade also testified in a deposition that it is the supervisor's responsibility to complete the Step 1 form. She testified that lead men were also provided training on Directive 007 so that they could fill out the incident report if necessary. (Docket Entry No. 69, Ex. 7 at 11).

Lister acknowledged that Smerek "made it very clear" to him that it was his responsibility to fill out the Step 1 form and warned him that refusing to do so was ground for firing him. (Docket Entry No. 69, Ex. 6 at 371 & 396). Smerek testified that after he asked Lister to fill out the incident report, Lister told him, "I know where you live." (Docket Entry No. 69, Ex. 4 at 129). Lister has not disputed making this comment.

Lister testified that he refused to fill out the form because he was not present during the accident, did not want to file a report without personal knowledge, and had previously had difficulties with Kelly. (Docket Entry No. 69, Ex. 6 at 371, 376–77, 396–99). Lister testified that Kelly had threatened him sometime earlier and that Lister had asked McHugh, Long, and Smerek to have Kelly transferred to a different department. (Docket Entry No. 69, Ex. 6 at 360–61; No. 76, Exs. 47, 48 & 49). Lister also testified that the on-duty employees he asked about the accident did not see it. He believed Kelly had lied about his injuries. (Docket Entry No. 69, Ex. 6 at 361–64, 396). Tassew eventually filled out the incident report after Lister refused. (Docket Entry No. 69, Ex. 3 at 100; Ex. 7 at 20).

On November 28, Lister sent an email to Jack Peoples, a manager in NOV's Human Resources department, and to several other members of NOV's management. In that email, Lister complained that NOV had failed to pay him all of the money he believed he was owed around the

time he took leave.  Lister also complained about threatening phone calls from individuals he believed to be NOV employees, and about scratches to his car, threats by Kelly, and workplace stress.  The following day, Lister forwarded the email to Long, McHugh, and Smerek.  In response, Long emailed McHugh, Smerek, and Shannon Weston, an NOV Human Resources manager, explaining that Lister's email "severely twist[ed] the facts" and that "we are at the point where Mr. Lister's focus is more on his perceived mistreatment and not on his job performance."  Long stated: "If he didn't have strong lead person support in his department[,] I don't think he could do this job on his own."  Long further explained that "people on the shop floor are seeing this go on and watching how we are treating [Lister] with kid gloves.  And then we have to do this right in the middle of trying to ramp up to the highest production levels ever for motors."  (Docket Entry No. 76, Ex. 37).

The "Step 2" meeting about Kelly's injury required under Directive 007 took place on November 30.  As Wade was walking in, she saw Lister, who asked if she had notified Kelly about the meeting.  Wade told Lister that it was his responsibility to do so.  Kelly attended the meeting. Lister did not, although he was required to do so under the Directive.  (Docket Entry No. 69, Ex. 7 at 29–31).

On December 1, Wade sent an email to McHugh describing the events surrounding Kelly's injury.  She explained that she had asked Lister to complete the Step 1 incident report and schedule the Step 2 meeting, but that he failed to do either or to attend the meeting.  She stated that she then asked Tassew "to complete the report" and that "he was reluctant to do so because he thought it was the supervisor's responsibility, but he did agree to submit."  (Docket Entry No. 76, Ex. 29).

On December 1, 2011, NOV fired Lister.  The termination form states the reason as "failure to follow HSE directive 07."  (Docket Entry No. 76, Ex. 28).  Smerek told Lister that he was fired for refusing to complete the Step 1 incident report.  (Docket Entry No. 69, Ex. 6 at 438).  Smerek testified in his deposition that Lister was fired for "insubordination" for refusing to complete the Step 1 paperwork and for not attending required meetings.  (Docket Entry No. 69, Ex. 4 at 130).  Houston and Tassew were not fired.

Lister testified that, unlike other non-black supervisors, he was never trained on Directive 007.  (Docket Entry No. 69, Ex. 6 at 452; No. 75, Ex. B at 2–3).  NOV has submitted four emails about Directive 007 sent in July and September by Matthew Finkel, an NOV HSE manager.  The employees receiving this email included Lister.  Several of these emails emphasized that the recipients were "required to go through training" and that "training is mandatory for everybody Supervisors role and above, in every department . . . ."  (Docket Entry No. 69, Ex. 8 at 3, 26, 29–31).  The emails set out the training dates and explained how to sign up.  The first email also included a complete copy of the Directive 007 incident reporting policy for the recipients to review.  (*Id.* at 4–25).  Lister does not contest receiving those emails.  Nor does he dispute failing to attend the Directive 007 training sessions.

Lister also asserts that NOV discriminated and retaliated against him by failing to inform him that he had been served with legal documents.  Lister alleges that while he was on medical leave, a process server attempted to serve him at the Sugar Land facility with a petition to increase his child- support obligations.  Lister alleges that NOV did not inform him of the attempted service.  (Docket Entry No. 75, Ex. B at 4).  Lister alleges that on December 19, 2011, after he had been fired, a process server came to the plant and effected substituted service by leaving the paper with

Stephanie Wade in NOV's Human Resources department.  NOV did not notify Lister of the service and did not notify the process server or the court that he no longer worked at NOV.  Lister alleges that he missed the court hearing at which child support was awarded.  (Docket Entry No. 75, Ex. B at 4; No. 76, Exs. 34 & 35).  Lister asserts that NOV knew how to contact him and his counsel, both while he was on leave and after he had been fired, and that it failed to do so in retaliation for his discrimination charge and suit as well as his decision to take FMLA leave.

On March 20, 2012, Lister filed a second charge of discrimination against NOV.  This lawsuit followed.

In the deposition Lister gave in this case, he told NOV for the first time that he cannot read and can only write his own name and the names of his wife and children.  Lister hid his illiteracy during his employment NOV.  He relied on help from his wife and lead men to complete paperwork.  (Docket Entry No. 69, Ex. 5 at 237–38; Ex. 6 at 376–78, Ex. 10 at 61).  He stated in an affidavit that he did not believe that reading was a qualification for his job because his supervisory duties did not require reading ability.  (Docket Entry No. 75, Ex. B).  NOV points to summary-judgment evidence making clear that the job required reading and writing.  McHugh stated in her affidavit that the supervisor position's official job summary, which NOV submitted into the record, includes responsibilities for "ensuring company policies and procedures are being enforced and adhered to[,] . . . complying with all NOV Company and HSE procedures and policies, and communicating necessary information to employees, other departments, and management team."  (Docket Entry No. 69, Ex. 9, ¶5; Ex. 9 at 3).

During discovery, NOV also learned that in his employment application, Lister had excluded information about two previous employers, because he had sued or filed charges against both.

17

(Docket Entry No. 69, Ex. 5 at 18–20).  Lister testified in his deposition that he intended to hide this information from NOV.  (*Id.*).

### C.     Procedural History

The plaintiffs filed a state-court petition on November 24, 2010.  NOV timely removed on January 11, 2011.  The plaintiffs filed their first amended complaint asserting claims under Title VII, 42 § 1981, and the TCHRA for disparate treatment and hostile-work-environment discrimination based on race, and for retaliation.  Lister also sued for interference and retaliation under the FMLA. NOV moved to dismiss Lister's FMLA interference and retaliation claims, and his retaliation claims under Title VII, § 1981, and Texas law.  (Docket Entry No. 55), and later moved for summary judgment on all of the plaintiffs' claims.  (Docket Entry No. 69).  NOV has also objected to certain evidence submitted by the plaintiff in opposition to summary judgment.  (Docket Entry No. 78). The plaintiffs have responded and replied and surreplied.

The motions, the arguments, and the record are analyzed below.

## II.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Triple Tee Golf, Inc. v. Nike, Inc*., 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  Although the party

moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.    NOV's Evidentiary Objections

NOV contends that certain documents used by the plaintiffs in opposition to summary judgment are inadmissible, and that certain factual statements in their response brief are not supported by any evidence in the summary-judgment record.

NOV objects to Plaintiffs' Exhibit 44, which are notes that John Jordan allegedly took of complaints by Jerry Wilson, who was a plaintiff in this case but whose claims were dismissed. NOV

also objects to Plaintiffs' Exhibit 45, a letter allegedly from Wilson to Misty Moore about finding the word "NIGGER" written on his toolbox, and Plaintiffs' Exhibit 46, a photograph of Wilson's toolbox with "NIG" written on it.

NOV contends that because Wilson has been dismissed from this suit, these exhibits, which directly relate to his former claims, are not relevant.  This objection is overruled.  Courts have admitted evidence of discrimination against nonplaintiff coworkers who are members of the plaintiffs' protected class.  *See Shattuck v. Kinetic Concepts, Inc.*, 49 F.3d 1106, 1109–10 (5th Cir. 1995) ("There is no proscription of evidence of discrimination against other members of the plaintiff's protected class; to the contrary, such evidence may be highly probative, depending on the circumstances."); *Visser v. Packer Eng'r Assoc., Inc.*, 924 F.2d 655, 659–60 (7th Cir. 1991) (en banc) (stating that evidence of fellow employees testifying in civil rights suits to racial slurs or other acts of racial discrimination against them by the employer are admissible because they are based on personal observation and other grounds of personal knowledge).

NOV also contends that Jordan's notes and Wilson's letter to Moore are inadmissible hearsay.  The plaintiffs contend that these exhibits are statements by made a party's agent or employee on a matter within the scope of that relationship and are not hearsay under Federal Rule of Evidence 801(d)(2)(D).  The plaintiffs also submit Wilson's sworn charge of discrimination filed with the TCHR.  Wilson stated in his charge that the word "nigger" was written on his toolbox and that he reported this incident, and another in which someone spit tobacco on his toolbox, to management, which did not address his complaint.  (Docket Entry No. 83-2 at 1).  Wilson's sworn charge is competent  evidence that he saw a racial epithet written on his toolbox and complained to NOV.  It is unnecessary to address NOV's hearsay objections to Exhibits 44 and 45.

NOV also objects to statements made by Lister and Williams in the declarations they attached to their brief opposing summary judgment.  NOV asserts that the declaration should be stricken in its entirety.  The inclusion of some inadmissible statements, however, is not a reason for striking the entirety of the declaration.  A court may disregard the portions of the declaration that are determined to be inadmissible as summary-judgment evidence.  *Akin v. Q-L Investments, Inc.*, 959 F.2d 521, 531 (5th Cir. 1992).

NOV objects to the following specific statements in Lister's declaration:

(1)     "I was 'promoted' to the Night Shift Supervisor position . . . due to my race (African American) and color in order to stop the drug and violence problems on the night shift.  Once I got those problems in check, my race, the very reason that I was hired, became the direct focus of discrimination against me leading to my termination."

(2)     "I was put in the supervisor position only as 'black intimidation.'"

(3)     "[T]he reality was that NOV hired me simply due to my race and color."

(4)     "Once those problems resolved, NOV had to create reasons to terminate my employment."

(5)     "[H]uman resources confirmed the discriminatory acts and slurs."

(6)     "Steve Long, my manager, implemented a policy on October 26, 2009 to all employees, for the purposes of disguising that he was refusing me a loan due to my race and the filing of a charge."

(7)     "I had just returned from FMLA leave a few days prior, suffering from medical issues related to NOV's discrimination against me."

(8)     "As I had been on FMLA leave for damages related to being subjected to race discrimination, I was singled out for discipline for not filling out the report."

(9)     "This was in direct retaliation for my complaints to the EEOC and my taking of FMLA leave."

(10)    "This was done with the full knowledge of and intent of the HR Department at NOV to retaliate against me."

(11)    "I had to go on FMLA leave as referenced above . . .  This was due to physical problems stemming from workplace discrimination and environment."

(12)    "In September 2009, I was reprimanded, as was Terrance Williams, for a laundry list of things that were untrue."

(13)    Lister's references to the "several" reasons for his termination.

(14)    "I later found out that [Butch Smerek] was excused from that meeting because he felt uncomfortable attending a meeting with me due to my EEOC complaint."

(15)    "[T]he TWC determined that I had not been terminated due to misconduct connected with the work and awarded me benefits."

(16)    "[T]he reality was that NOV hired me simply due to my race and color to intimidate and bring into check significant drug and violence problems that the white night supervisor was unable to handle."

(17)    "[W]hile I was given the title of supervisor, I was never treated as a supervisor since I was never given complete training and never given the true responsibilities of a supervisor, unlike my non-black co-worker supervisors, such as John Jordan."

(18)    "Had I been assigned actual supervisor duties, NOV might have detected that I could not read.  Reading was not a qualification for my job.  If it had been a qualification for my job, NOV never found out because they did not actually assign me supervisory duties or train me for them."

NOV makes similar objections to the following statements in Williams's declaration:

(1)    "I was hired for the night shift position due to my race (African American)."

(2)    "Once I got those problems in check, my race, the very reason was hired, became the direct focus of discrimination against me leading to my termination."

(3)    "The white employee was not written up and received no discipline . . .  That employee was not fired or disciplined in any way."

(4)    "Again, a report was made to human resources, but no police report or incident report was submitted, no investigation was performed by NOV."

(5)    "I was falsely accused of having sexual relations with an employee on company premises in direct retaliation for my complaints of harassment and discrimination."

(6)     "I was subject to investigation for it under the stereotype that Black African American men cannot control their sexual desires."

(7)     "I was hired under the guise of employment as a night supervisor, but the reality was that NOV hired me simply due to my race and color. . . .   Once those problems resolved, NOV had to create reasons to terminate my employment based on race and color."

(8)     "In September of 2009 I was reprimanded along with Romeo Lister for a laundry list of matters, none of which were true."

(9)     "Following my termination, NOV reported my wages to a state agency I believe in such a way as to cause felony criminal charges to be filed against me."

(10)    "I believe NOV reported my income in this manner in order to interfere with my ability to find work . . . .  NOV's report to the D.A. about my income is a lie."

(11)    Williams's references to the "several" reasons for his termination.

(12)    "According to a warehouse employee on the night shift, another warehouse employee under my supervision on the night shift stated that I was an uppity person, and then stated that if it was up to him, he would put me in chains, tie me to his bumper and drag me down the street to my death.  The employee gave a statement that I then took to human resources."

(13)    "[T]he guard who was working at the gate at NOV reported that a terminated white co-worker from my night shift at NOV went to the guard gate, asked for me and then, with his shotgun in his vehicle, stated that he was going to get me."

(14)    "I made a complaint regarding a white employee who threatened to drag me behind his truck."

(15)    " I was never treated as a supervisor since I was never given complete training and never given the true responsibilities of a supervisor, unlike my nonblack co-worker supervisors."

NOV objects to Lister Statements (1)–(13) and Williams Statements (1)–(11) on the grounds that they are conclusions of law, state ultimate facts, and are not based on the plaintiffs' personal knowledge.  Lister Statements (1)–(4), (6), and (8)–(10) and Williams Statements (1)–(2) and (5)–(7) are admissible under Evidence Rule 701 as lay opinions, *see, e.g.*, *Meaux Surface Protection,*

*Inc. v. Fogleman*, 607 F.3d 161, 168 (5th Cir. 2010) (citations omitted), but are not evidence that they were actually discriminated and retaliated against. The merits of the plaintiffs' discrimination and retaliation claims are addressed below. Lister Statements (7) and (11) are relevant to explaining why Lister felt he needed to take medical leave but are not evidence of discrimination. Lister Statement (12) and Williams Statement (8), which are about the plaintiffs' September 2009 meetings with NOV management, are addressed below. Lister Statement (13) and Williams Statement (11), which concern the plaintiffs' assertion that there were "several" reasons for their terminations, are admissible under Evidence Rule 701. NOV's objections to Williams Statements (3) and (4), which concern Williams's complaints to NOV about two incidents and NOV's response, are denied. NOV does not provide specific reasons for why these statements are inadmissible. Williams's declaration provides sufficient context to infer that he has personal knowledge about his complaints to NOV and about whether NOV disciplined the employee involved. Williams's Statements (9) and (10), which relate to his belief that NOV incorrectly reported his income to state authorities resulting in a criminal indictment, are inadmissible because Williams has not shown that they are based on his personal knowledge of what NOV reported. Williams's allegations concerning NOV's income reporting are discussed more below.

NOV objects to Lister Statements (14) and (15) and Williams Statements (12) and (13) on the ground that they are inadmissible hearsay. *See Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006) (hearsay evidence is inadmissible for summary judgment purposes under Federal Rule of Civil Procedure 56). Lister responds that Lister Statement (14), which concerns Smerek's absence from the meeting at which Lister's failure to comply with Directive 007 was discussed and the reasons for that absence, is not hearsay because it is corroborated by other evidence in the record, including

24

Long's deposition.  Although Long testified in his deposition that Smerek was not present, he did not give a reason why.  Lister's assertion that Smerek was absent because he was "uncomfortable" attending a meeting with him due to his discrimination charge is based on a statement by an unnamed third individual and is hearsay.  Because Lister has not pointed to an applicable exception to the hearsay rule, it is not admissible.  NOV's hearsay objection to Lister Statement (15), which concerns the TWC's determination that he had not been terminated due to misconduct, is moot because Lister has submitted a copy of the relevant determination.  (Docket Entry No. 83, Ex. K).

Williams contends that Williams Statement (12) is admissible as a party admission under Evidence Rule 801(d)(2) because he gave NOV a statement from the employee who threatened to tie him to a bumper in chains and drag him down the street.  Williams does not state which subpart of Rule 801(d)(2) applies.  The employee's threatening remark was not made by NOV in an individual or representative capacity, was not adopted by NOV or believed by it to be true, and was not made by a person who was authorized to make a statement on that subject.  No section of 801(d)(2) appears to apply.  FED. R. EVID. 801(d)(2)(A), (B), ©, (E).  It appears that Williams believes that the threatening statement is not hearsay under because it "was made by the party's agent or employee on a matter within the scope of that relationship and while it lasted."  FED. R. EVID. 801(d)(2)(D).  The warehouse employee's threat, however, was not made within the scope of his employment with NOV. *See Magiera v. City of Dallas*, 389 F. App'x. 433, 439 (5th Cir. 2010) (holding that statements were not hearsay under Rule 801(d)(2)(D) because the employees who made the statements "were tasked with assigning eligible officers to particular . . . shifts . . . [making] their discussion regarding why [the plaintiff] was prohibited from training . . . 'a matter within the course of their agency or employment,' rather than mere water-cooler gossip.").  Williams

25

Statement (13) is inadmissible for the same reason and also because when former employee made the threatening remark, he was no longer employed by NOV. Additionally, contrary to Williams's suggestion, this remark, which Williams did not hear, is not admissible as a present-sense impression. And even if these statements were admissible, they would not change the outcome of the summary-judgment motion, for the reasons explained below.

NOV objects to Lister Statements (16)–(18) and Williams Statements (14) and (15) on the ground that they are contradicted by the plaintiffs' deposition testimony. Lister Statements (16)–(18) and Williams Statement (15) relate to the reasons why the plaintiffs were hired as supervisors and their responsibilities. This circuit recognizes the sham-affidavit rule. *See Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000). "This authority stands for the proposition that a nonmoving party may not manufacture a dispute of fact merely to defeat a motion for summary judgment." *Id.* "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting the affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)). Because NOV does not point to testimony by the plaintiffs that directly contradicts these statements, the issues raised are more appropriately addressed on the merits. But Williams Statement (14), in which he states that he complained about the warehouse employee's threat to drag him in chains, is directly contradicted by Williams's deposition testimony that a coworker who heard the comment made a complaint but he did not. (Docket Entry No. 69, Ex. 1 at 13). This statement is not competent summary-judgment evidence.

26

NOV also points to 21 assertions that the plaintiffs make in their summary-judgment response brief, which NOV contends are not supported by the record.  The statements are:

(1)     "[B]oth [Plaintiffs] were actually placed on the night shift to be, for lack of a better term, black intimidation."

(2)     "As such, Williams and Lister were never given the trappings of supervisors . . . never given the responsibilities of supervisors."

(3)     "When their usefulness as being Black intimidation was complete, they were both forced from their employment."

(4)     "There is some dispute as to whether Defendants [sic] actively participated in good faith."

(5)     "Neither was trained to hold the positions they were assigned as neither was ultimately expected to actually execute the duties of the positions,"

(6)     "Both Williams and Lister were put in the position of night supervisor but not trained as night supervisors — they were not much more than security guards given the actual duties of cleaning up the lack of discipline and apparent criminal activity on the night shift."

(7)     "They were placed in the position of supervisors merely to intimidate the night shift personnel into complying with NOV rules, and when compliance was complete, they were both terminated."

(8)     "They were given the duty of being Black intimidation on the shift."

(9)     "Further, each was in a position where they were surrounded by racial markings, such as the word 'NIG' scrawled on a toolbox . . . ."

(10)    "Lister and Williams each assert that they have been retaliated against due to . . . filing suit . . . .  As to Williams, post-termination, NOV provided information that resulted in a felony criminal indictment and resultant loss of his job."

(11)    "NOV skirted the training given on their own policy — the adventurously-titled 'Directive 007."

(12)    "Directive 007 . . . is one more policy and procedure on which Lister did not receive training"

(13)    "Some of the training denied [Lister] was on Directive 007."

(14)  "Reynaldo Pena testified regarding Exhibit 1 [NOV's anti-harassment policy] . . ."

(15)  "Long also even saw the word himself and took a picture."

(16)  "Wilson had reported to John Jordan, his white supervisor, that he was being singled out racially and not trained for his position due to his race and further complained that the word 'NIGGER' had been written on his toolbox, his box had been spat in, and that a photo of the word 'NIG' had been provided to NOV as proof.  These were precisely the same type complaints made by Williams and Lister, but no investigation was done."

(17)  "Long however suspected that Williams or Lister had written 'NIGGER' as we thought it was something they might do since because of the EEOC charges, we did not trust them . . . .  NOV after the toolbox matter December 2009 and the EEOC charges in August 2009 had no further trust in Williams or Lister."

(18)  "Hrnicko made no complaint, but Steve Long raised inquiry as to why that occurred instead of Hrnicko asking Williams as his direct supervisor. . . .  Long went fishing for a reason to terminate Williams . . . .  Long then continued to pester Hrnicko, and without any new information and disregarding that any dispute between Hrnicko and Williams was minimal and was otherwise resolved, Long with several others fired Williams."

(19)  "Neither Houston nor Tassew immediately filled out the incident report but neither was reprimanded or terminated from employment."

(20)  "Lister did attend the follow-up meeting the next day when Kelly was not there."

(21)  "[Lister's FMLA] leave was of course due to the race discrimination and harassment to which Lister had been subjected."

To the extent the statements are conclusory, reflect subjective beliefs, or are speculative statements about someone else's knowledge or intent, they are not competent summary-judgment evidence.  NOV specifically objects to the relevance of Reynaldo Pena's testimony about his interpretation of NOV's antiharassment policy and his competence to testify about that policy.  Among other things, Pena testified that a white employee referring to a black employee as being "tribal" would be discriminatory and harassing under NOV's policies.  Even if Pena was competent

to testify about NOV's policies, his testimony is not relevant to the issue presented on summary judgment: whether there are genuine factual disputes material to deciding whether NOV's challenged employment actions were actionable discrimination, harassment, or retaliation under federal and state law.

**IV.     Analysis**

        **A.     The Race Discrimination Claims**

                **1.     The Legal Standard**

Under Title VII, it is unlawful for any employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  Disparate treatment claims under Title VII, § 1981, and the TCHRA require a plaintiff to prove intentional discrimination and are considered under the same standard.  *See Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir. 2010) (citing *Pegram v. Honeywell, Inc.*, 261 F.3d 272, 281 n.7 (5th Cir. 2004)); *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 408 (5th Cir. 2002); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999).  Intentional discrimination can be established through either direct or circumstantial evidence.  *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001).

When, as here, a plaintiff attempts to prove discrimination through indirect or circumstantial evidence, the claims are considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under the modified *McDonnell Douglas* approach, the plaintiff has the initial burden of making a *prima facie* showing of discrimination.  *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011); *see also McDonnell Douglas*, 411 U.S. at 802.

The elements of a *prima facie* showing are that the plaintiff: (1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class or, in the case of disparate treatment, was treated more harshly than others who were similarly situated. *Bouie v. Equistar Chems. LP*, 188 F. App'x 233, 236–37 (5th Cir. 2006); *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001).

The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  If the employer sustains its burden, the *prima facie* case dissolves, and the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's protected characteristic. *Vaughn*, 665 F.3d at 636 (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).  In a mixed-motive case, if the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus.  *Rachid*, 376 F.3d at 312.

A plaintiff may show that the employer's proffered reasons are pretextual "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Smith v. Sw. Bell Tel. Co.*, 456 F. App'x 489, 492 (5th Cir. 2012) (quotation marks and citation omitted).  To raise a fact issue pretext, a plaintiff must rebut each of the proffered nondiscriminatory reasons with "substantial evidence." *Johnson v. Manpower Prof'l Servs.*, 442

F. App'x 977, 981 (5th Cir. 2011) (quotation marks and citation omitted); *see also Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254 (5th Cir. 2011).

### 2.    Issues as to Both Plaintiffs

The plaintiffs claim that, in comparison to non-African-American employees, they were discriminated against when they were: (1) hired as supervisors in order to serve as "black intimidation" on the night shift; (2) denied access to security cameras; (3) not provided company keys; (4) denied an office and computer; (5) excluded from supervisory meetings; (6) denied adequate training; and (7) reprimanded, and (8) wrongfully terminated.  Lister also claims that he was denied pay loans given to nonblack employees.

NOV argues that many of the discriminatory acts the plaintiffs allege cannot themselves provide the basis for recovery because they are not adverse employment actions under Title VII. "As to discrimination claims, 'Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions.'"  *Preston v. Tex. Dep't of Family & Prot. Servs.*, 222 F. App'x 353, 358 (5th Cir. 2007) (quoting *Dollis v. Rubin*, 77 F.3d 777, 781–822 (5th Cir. 1995) (per curiam)). Ultimate employment decisions include actions such as "hiring, granting leave, discharging, promoting, and compensating."  *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004)).  The plaintiffs' discrimination claims arising out of NOV's alleged denied access to security cameras; failure to provide company keys; denial of an assigned office and computer; exclusion from supervisory meetings; reprimands; denial of a pay advance;[3] and denial of adequate training are not

---

[3] Lister has also failed to point to any evidence suggesting that NOV's denial of his request for a pay advance was based on his race.  The record reflects that when Lister requested a pay advance, NOV changed its policy and stopped offering those advances because, in its opinion, employees had relied on those advances overly frequently.  Lister has not pointed to any evidence that after this policy change, NOV

in themselves a basis for recovery because they are not actionable adverse employment actions.  *See, e.g.*, *Hollimon v. Potter*, 365 F. App'x 546, 549 (5th Cir. 2010) (failure to train is not an ultimate employment decision); *Roberson v. Game Stop/Babbage's*, 152 F. App'x 356, 361 (5th Cir. 2005) (denial of training is not an adverse employment action); *Wooten v. St. Francis Med. Ctr.*, 108 F. App'x 888, 891 (5th Cir. 2004) (moving an employee to smaller office that was previously a storage closet was not an adverse employment action); *Garrison v. Tex. S. Univ.*, 2012 WL 5351216, at *5 (S.D. Tex. Oct. 23, 2012) (plaintiff's claim "that she was not provided with a key to get into the law school rooms that she needed access to on weekends and holidays" did not amount to an ultimate employment decision);  *Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 885 (S.D. Tex. 2010) ("assignment to a small office [and] denial of a larger and better located office" were not ultimate employment actions); *Matthews v. City of Houston Fire Dept.*, 609 F. Supp. 2d 631, 645 (S.D. Tex. 2009) (exclusion from "major meetings" is not an adverse employment decision); *Oyoyo v. Baylor Health Network, Inc.*, 2000 WL 655427, at *5 (N.D. Tex. May 17, 2000) ("[T]hat some employees were given keys to the office, whereas [plaintiff] did not receive one . . . simply do[es] not rise to the level of an ultimate employment action.").  While such allegations and evidence may support an inference that an actionable ultimate employment action, such as a termination, was discriminatory, they do not provide a basis for recovery in themselves.

The plaintiffs do not allege that NOV failed to hire them based on race.  Although the plaintiffs allege that NOV hired them to serve as "black intimidation" on the night shift, and hiring decisions are ultimate employment actions, the decision to hire an employee, unlike a decision not

---

continued offering such advances to white employees but not to black employees.  Before the policy change, Williams, a black employee, had received at least one pay advance from NOV.

to hire an employee, is not an "adverse" action under Title VII.  *See* 42 U.S.C. § 2000e-2(a)(1)

(prohibiting under Title VII an employer's decision "*to fail or refuse to hire* or to discharge any

individual, or otherwise to discriminate against any individual with respect to . . . compensation,

terms, conditions, or privileges of employment, because of such individual's race." (emphasis

added)).  As NOV points out, the summary- judgment evidence does not support an inference that

hiring either Lister or Williams as a night-shift security guard was actionable racial discrimination.

In their summary-judgment response, the plaintiffs also refer to Long's "tribal comment" and

an incident in which the word "NIG" was scrawled on a toolbox belonging to another individual as

evidence of harassment and of discrimination.  As to the harassment claim, as discussed in detail

below, the evidence does not show the type or extent of harassment necessary to support such a

claim.   As to the discrimination claim, the Fifth Circuit has identified two separate tests for

evaluating when workplace remarks or conduct can be considered circumstantial evidence of

discrimination.  Under the first test, a plaintiff needs to show only: (1) discriminatory animus (2) on

the part of a person that is either primarily responsible for the challenged employment action or by

a person with influence or leverage over the relevant decisionmaker.  *Reed v. Neopost USA, Inc.*,

701 F.3d 434, 441 (5th Cir. 2012); *see also Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226

(5th Cir. 2000).   Under the second, more stringent test, a workplace remark is evidence of

discrimination if it is (a) related to the protected class of persons of which the plaintiff is a member,

(b) proximate in time to the employment decision at issue, © made by an individual with authority

over the employment decision at issue, and (d) related to the employment decision at issue.  *Haire*

*v. Bd. of Sup'rs of La. State Univ. Ag. & Mech. College*, 719 F.3d 356, 366 (5th Cir. 2013); *see also*

*Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2001); *Brown v. CSC Logic, Inc.*,

82 F.3d 651 (5th Cir. 1996).  The Fifth Circuit has recently acknowledged its failure to clarify which test applies in circumstantial-evidence cases and in what circumstances.  *See Katseanes v. Time Warner Cable, Inc.*, 511 F. App'x. 340, 345 n.2 (5th Cir. 2013) ("Our precedent is unclear whether the four-part stray-remarks test . . . applies to both direct- and circumstantial-evidence cases.").

The  evidence the plaintiffs identify does not meet either test.  Long's "tribal" comment, while tone deaf and offensive, was too attenuated and too remote in time from the decisions to fire either plaintiff to support an inference of discrimination.  *Manaway v. Med. Ctr. of Se. Tex.*, 430 F. App'x. 317, 323 (5th Cir. 2011) ("Manaway claims that Smith threatened to send the Ku Klux Klan to an African–American co-worker's house.  Assuming Smith actually made this statement, it was made one year prior to Manaway's termination and was not made in the context of Smith's decision to terminate Manaway."); *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010) (stating that a comment made one year before adverse employment action and unrelated to employment action does not establish a genuine issue of material fact regarding pretext).  The plaintiffs have not pointed to evidence that the racially offensive remark on the toolbox belonging to another employee was made by a person responsible for deciding to fire them or that it was sufficiently close in time to those decisions to raise a fact dispute as to pretext or motivating factor.

The plaintiffs' actionable disparate treatment claim is that NOV unlawfully terminated them based on their race.  These claims are addressed below.

### 3.    Terrance Williams's Disparate Treatment Claims

NOV has presented a legitimate nondiscriminatory reason for firing Williams:  three of the employees who worked for Williams accused him of mistreatment, including threats of violence, which NOV found credible following an investigation.  Discharging an employee for violating

company policy, such as the policy against workplace threats, is a legitimate, nondiscriminatory reason for terminating an employee.

Williams argues that he was fired based on discriminatory discipline after another employee, Randy Hrnicko, asked the day-shift supervisor about his pay.  Williams fails to point to competent summary-judgment evidence that this was the reason for his job termination.  Julia McHugh's notes indicated that NOV had earlier addressed the Hrnicko situation with Williams, but he was not fired.  Williams's termination came several days later, after the three NOV employees complained that Williams had been threatening them.  Those employees provided signed statements in which they confirmed that Williams had threatened to fire, fight, and shoot them.  NOV has also provided uncontroverted evidence that it investigated those allegations, including by interviewing the employees who complained, Williams, and other supervisors.  (Docket Entry No. 69, Ex. 3 at 9–27).  NOV has produced an internal document, which appears to have been signed in March 2010, stating that Williams was fired for a "violation of [company] harassment policy, creating hostile work environment & behavior unacceptable as a superior."  (Docket Entry No. 69, Ex. 1 at 24).  This document is consistent with NOV's explanation that it decided to fire Williams only after three of his reports complained about his threatening behavior.

As noted, the summary-judgment record contains no evidence that other non-African-American supervisors were subjected to different discipline for similar misconduct.  There is no allegation or evidence that when employees whom Williams supervised accused him of threats and harassment, NOV responded in bad faith or unreasonably.  Instead, the evidence shows that NOV investigated and concluded that the accusations were well-founded.  "The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory

motive." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995); *see also Bryant v. Compass Grp. USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (disregarding the plaintiff's claim of innocence because no evidence called into doubt the employer's good-faith suspicion that the employee stole from the employer).  Williams does not address NOV's proffered nondiscriminatory reason for firing him in either his response or surreply briefs opposing summary judgment.

Williams asserts that NOV did not tell him the reason it fired him, but he does not point to evidence supporting that assertion or explain how it is relevant to his discrimination claims. Williams's failure to point to evidence supporting an inference that the decision to fire him was pretextual or motivated by his race or creating a factual dispute material to deciding whether the decision was pretextual or motivated by his race is fatal to his discrimination claims.[4]

Williams also asserts for the first time in opposition to summary judgment that he was denied a promotion.  Williams did not mention NOV's failure to promote him in either his EEOC charge or in his complaints in this case.  In his summary-judgment response, Williams asserts that he had been working with Stacey Winter, NOV's director of employee development, to progress and get promoted but that, after he filed his EEOC charge, NOV refused to meet with him to discuss a promotion.  Williams failure-to-promote claim appears to arise under Title VII's antiretaliation provision.  But Williams's failure-to-promote allegation does not support a discrimination claim.

In Winter's deposition, she testified that Williams had applied to a position that would require travel abroad.  Williams was interviewed for the position, but a white employee was hired.

---

[4] Williams also points to NOV's alleged "reprimands" for transferring Cleve Scott and Akeem Alsadnn without proper approval.  Williams does not contend, however, that these were the basis for NOV's decision to fire him or for any other "ultimate employment action" under Title VII.

Williams does not state what position he applied for, when he applied for it, what qualifications the position required, whether he possessed those qualifications, or whether he was as qualified as the white employee who was ultimately hired.  Williams asserts that Winter called off her lunch meeting with him to discuss advancement because he had "mentioned that he felt that there was some issue with his race . . . and there's nothing [she] could do to help him from there."  But Williams selectively omits relevant portions of Winter's testimony.  The portions of Winter's deposition transcript that Williams submits do not reflect the purpose of Winter's scheduled meeting with Winter, including whether it was relevant to Williams's request for a promotion.  Williams also omits from his opposition brief the reason Winters provided for cancelling their meeting:  that Williams's complaints about discrimination were something that "he needed to take to HR." Williams's summary-judgment response includes Winters's testimony immediately before and after her explanation that she told Williams that the Human Resources department was the appropriate place for him to make his discrimination complaints, but replaces this explanation with ellipses. Winter's statement to Williams that his discrimination complaints should be made to the Human Resources department is not evidence that NOV failed to promote him for discriminatory reasons.

### 4.    Romeo Lister's Disparate Treatment Claims

Lister contends that because NOV failed to provide him with training on Directive 007's incident-reporting procedures, NOV's decision to terminate him for not following those procedures is evidence of pretext.  NOV, however, has submitted competent and uncontroverted evidence that it sent Lister, as well as other supervisory employees, no fewer than four emails clearly stating that they were required to go through training on Directive 007 and specifying the times and dates that he and other supervisors could sign up for training.  Lister did not attend these training sessions.

The first of the emails that Lister received about Directive 007 included a complete copy of the Directive.  It is also undisputed that after Kelly was injured and sought medical attention, he was instructed several times to complete the steps required by the Directive, including to complete the report and to set up and attend the meeting about the injury.

Lister asserts that he refused to complete the Step 1 report for various reasons including that he was not present when the accident occurred, he did not want to file a false report, and he had previously had difficulties with Kelly.  Lister has not identified evidence that his previous difficulties with Kelly would have prevented him from accurately completing the Step 1 report. Lister also has not pointed to facts suggesting that NOV directed him to file a false report.  If the evidence Lister gathered in completing his Step 1 Report showed that Kelly was not injured, Lister could have noted that in the report.

Lister also argues that his refusal to complete the Step 1 report did not violate Directive 007. He contends that it was Tassew or Houston's responsibility to fill out the incident report.  In support, Lister points to an email from Stephanie Wade stating that during lead-man training, the leads were told to complete the incident report "if the incident occurred while they were providing supervision or if they had first knowledge of the incident." (Docket Entry No. 75, Ex. 32).  Lister asserts that while he was not at work the day of the incident, Houston was.

Directive 007, which has been submitted into evidence, clearly and repeatedly states that it is the supervisor's responsibility to complete the Step 1 report.  The policy does not mention lead men.  Moreover, even if Lister is right that his supervisors incorrectly believed that he had primary responsibility for completing the Step 1 form after Kelly's injury, NOV's failure to act strictly in accordance with its policy is not in itself evidence of discrimination. *See Moore v. Eli Lilly & Co.*,

990 F.2d 812, 819 (5th Cir. 1993) ("Proof that an employer did not follow correct or standard procedures in the termination or demotion of an employee . . . . may well be unfair or even unlawful yet not be evidence of" discrimination." (footnote omitted)); *see also Bauer v. Albermarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999) (holding that the employer's belief that the plaintiff was assisting "actual or potential competitors does not have to be proven to be correct in order for [the plaintiff's] involvement with [with those companies] to be a legitimate, non-discriminatory reason for self-protective measures, so long as the belief is reasonable, not arbitrary, and not a likely pretext for unlawful discrimination."); *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995) ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent . . . ." (emphasis omitted)).

Lister contends that NOV's decision to fire him for not complying with Directive 007, while not firing or disciplining Tassew or Houston, is evidence of discriminatory treatment. "To demonstrate that other employees were given preferential treatment in similar situations, [Lister] must provide evidence that those employees engaged in misconduct under nearly identical circumstances." *Arceneaux v. Metropolitan Life Ins. Co.*, 481 F. App'x. 196, 198 (5th Cir. 2012); *see also Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) ("Disparate treatment occurs where an employer treats one employee more harshly than other 'similarly situated' employees for 'nearly identical' conduct.'" (citation omitted)). Furthermore, to be "similarly situated," employee must have "held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259-60 (5th Cir. 2009) (internal citations omitted). NOV points out, however, that Tassew was a lead man in Lister's department and

39

Houston a lead man in another department.  Because they did not share the same job or responsibilities as Lister, a supervisor, neither Tassew nor Houston was "similarly situated." Additionally, because Tassew is African-American, he is a member of the protected class.  NOV's failure to fire Tassew weakens, not supports, Lister's discrimination claim.  The record also shows that although Tassew was initially reluctant to complete the incident report, which he believed to be Lister's responsibility, he ultimately agreed to and did complete the report.  (Docket Entry No. 75, Ex. 29).  Lister has not sufficiently alleged or shown that Tassew and Houston are comparators under Title VII.

Lister also compares himself to Butch Smerek, who did not attend the meeting at which Lister was terminated.  The meeting occurred several days after Lister's own absence from the Directive 007 meeting.  Lister points out that Smerek was excused from attendance and was not terminated or disciplined.  Smerek is not a "similarly situated" employee because he did not share the same job or responsibilities as Lister.  Moreover, Lister has not pointed to evidence showing that the circumstances surrounding his absence from the meeting were sufficiently similar to the circumstances surrounding Smerek's absence to support an inference of discrimination.  In sum, Lister has not identified any similarly situated employees who were not discharged for misconduct "nearly identical" to his own.

Additionally, even if Lister did not initially understand his responsibilities under Directive 007, the uncontradicted evidence shows that both Wade and Smerek specifically informed Lister that he needed to complete the Step 1 form, gave him ample opportunity to do so, and informed him of the consequences for failing to comply.  Lister's refusal to comply, even after instructed, and his threat to Smerek, are evidence of insubordination, which is an independent and sufficient ground

for termination.  *See Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 167–68 (5th Cir. 1999) ("The failure of a subordinate to follow the direct order of a supervisor is a legitimate nondiscriminatory reason for discharging that employee.").

NOV also asserts that Lister cannot prove that he was qualified for his position because, as he acknowledged in his deposition, he was unable to read or write.  Lister points out that he hid his inability to read and write from NOV and that NOV did not base its decision to fire him directly on his illiteracy.  He contends that, as a result, his inability to read and write is irrelevant to his discrimination claims.  The Fifth Circuit has held that "[a] plaintiff challenging his termination or demotion can ordinarily establish a prima facie case of . . . discrimination by showing that he continued to possess the necessary qualifications for his job at the time of the adverse action" and that he "had not suffered physical disability or loss of a necessary professional license or some other occurrence that rendered him unfit for the position for which he was hired."  *Holliday v. Commonwealth Brands, Inc.*, 483 F. App'x 917, 921 (5th Cir. 2012) (internal quotation marks and citation omitted).  A plaintiff's qualifications are relevant to whether he can establish a *prima facie* case.  *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 350–51 (5th Cir. 2007).

The unrebutted evidence shows that Lister was unable to read and write.  Both Lister and his wife acknowledged this fact in their depositions.  Lister contends that reading and writing skills were not necessary in his job because, despite being a supervisor, he was not assigned supervisory responsibilities.  Uncontroverted evidence in the summary judgment record shows otherwise.  NOV submitted into the record Lister's official job summary, which reflects that he was required to comply with, communicate, and enforce company procedures.  The record also reflects that Lister received emails about company procedures, including Directive 007, that he was responsible for

41

reading those emails and the copies of procedures that were attached, and that he was required to complete reports on employees, including incident reports. Lister acknowledged that due to his illiteracy, he could not perform these responsibilities on his own. He had to rely on assistance from his wife and other employees to complete these responsibilities. Lister has not shown that he had the qualifications necessary to perform his essential job duties.

Even if Lister could make a *prima facie* showing of his qualifications, his later-disclosed inability to read or write provides further evidence that he refused to follow instructions to do the report on Kelly's injury. Lister's illiteracy and desire to hide it is consistent with his refusal to follow NOV's clear written policy requiring him to complete the Step 1 report after the Kelly incident, even after receiving emails from Wade instructing him to do so. NOV did not know about Lister's illiteracy, but knew that he was refusing to follow company policy and his manager's instructions. The record precludes any inference of discrimination in the decision to fire him.

In sum, the plaintiffs have failed to point to evidence giving rise to fact disputes material to determining whether NOV discriminated against them on the basis of their race.

**B.     The Retaliation Claims**

**1.     The Legal Standard**

Under Title VII, it is unlawful for any employer to retaliate against an employee "because he has *opposed* any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or *participated* in any manner in an investigation, proceeding, or hearing under [Title VII]." *Id.* § 2000e-3(a) (emphasis added). Courts refer to the first part of Title VII's antiretaliation provision as the "opposition clause," and the second part as the "participation clause." *See, e.g.*, *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419 (5th Cir. 2000).

When, as here, a plaintiff seeks to prove retaliation through circumstantial evidence, she has the initial burden to make a *prima facie* showing of retaliation.  A plaintiff must show that: (1) he was engaged in activity protected by Title VII; (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse action. *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 484 (5th Cir. 2008).  As with disparate impact claims, if a plaintiff makes a *prima facie* case, the burden shifts to the defendant to proffer a legitimate nonretaliatory reason for the employment action.  *Id.*  If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation.  *Id.*  "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . .  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ─── U.S. ────, 133 S. Ct. 2517, 2533 (2013); *see also Wright v. St. Vincent Health Sys.*, ─ F.3d ─, 2013 WL 5225214, at *4 (8th Cir. Sept. 18 2013) (applying a "but for" causation standard to a § 1981 retaliation claim).

The plaintiffs point out that the standard for adverse employment actions is broader for retaliation claims than for discriminatory treatment claims.  Title VII's antiretaliation provision "must be construed to cover a broad range of employer conduct." *Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863 (2011).  In *Burlington Northern and Santa Fe Railroad Co. v. White*, 548 U.S. 53 (2006), the Supreme Court held that employer actions prohibited by the antiretaliation provision, unlike actions prohibited under the antidiscrimination provision, were not limited to conduct that affects the employee's "compensation, terms, conditions, or privileges of employment," § 2000e–2(a)(1), because adopting that approach "would not deter many forms that effective

43

retaliation can take." *Id.* at 64. The Court interpreted Title VII's antiretaliation provisions again in *Thompson v. North American Stainless, L.P.*, holding that those provisions were broad enough to protect an employee who was fired in retaliation for a discrimination charge filed by family member. "Title VII's antiretaliation provision prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 868 (quoting *Burlington N.*, 548 U.S. at 68). "It does so by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Burlington N.*, 548 U.S. at 68 (internal quotation marks and citation omitted). Nevertheless, "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.*

### 2. Terrance Williams's Retaliation Claims

Williams contends that he was subjected to five retaliatory actions after he filed his EEOC charge on August 10, 2009. First, Williams contends that he was required to attend a meeting in September 2009, the first discipline he had received at NOV. The record evidence shows, however, that this was a meeting to discuss issues in the night shift and did not constitute or result in any discipline for either individual. (Docket Entry No. 76, Exs. 15, 16). Williams has failed to point to evidence showing that this meeting was disciplinary in nature or would have deterred a reasonable person from engaging in protected activity.

Williams's second and third alleged retaliatory actions are that he was reprimanded in February 2009 and February 2010 — after he filed the EEOC charge — for deciding — before the EEOC charge — to allow two employees who worked for him to transfer. Williams alleged that NOV had previously approved the transfers. NOV has pointed to summary-judgment evidence

44

showing that the exhibits Williams cited to support his claim of an August 2009 transfer and February 2010 reprimand show that there was no issue about the 2009 transfer.  (Docket Entry No. 75, Exs. 22, 39).  The record shows that NOV did raise an issue in 2010 that when this employee was transferred again that year, Williams failed to follow the proper procedure in approving the transfer.  This is a legitimate nonretaliatory reason for its actions.  Williams has not pointed to evidence suggesting that NOV's reasons were pretextual or that its actions were retaliatory. Williams does not identify summary-judgment evidence showing that he followed the proper procedures for transferring the individual the second time.  And the record shows that NOV did not reprimand Williams or impose other discipline for this 2010 transfer in February of that year.  (*Id.*).

Williams cites what he characterizes as a reprimand for approving the transfer of another employee, which NOV knew of and allowed.  But NOV again notes that the summary-judgment evidence Williams cites in support is not a reprimand but rather an email about the transfer in February 2010.  (Docket Entry No. 76, Exs. 22, 40).

Williams contends that his termination was in retaliation for his discrimination complaint. NOV has proffered a legitimate reason for firing Williams: that he harassed and threatened violence against several of the employees who worked under him.  Williams has failed to identify evidence suggesting that he would not have been fired but for the EEOC charge he had filed seven months earlier.  In addition to the time lapse, he has also failed to point to evidence suggesting that NOV did not reasonably believe, after its investigation, that Williams had threatened the employees. Williams has not raised a genuine fact dispute material to determining whether the decision to fire him was retaliatory.

45

Fifth, Williams asserts that NOV retaliated against him after he was fired by providing information resulting in a felony criminal indictment for food-stamp fraud. As NOV notes, however, Williams has failed to point to competent evidence that NOV provided information about Williams's salary to the district attorney's office. Williams has also failed to respond to the summary-judgment evidence NOV submitted showing that it provided accurate information to the State of Texas about Williams's earnings, consistent with its reporting obligations. (Docket Entry No. 82, Ex. 18).

### 3.     Romeo Lister's Retaliation Claims

Lister's EEOC discrimination charge filed on August 10, 2009 and his lawsuit filed in November 2010 are protected activities under Title VII. Like Williams, Lister alleges that in September 2009, within 30 days of filing his EEOC charge, he was required to attend a meeting and that this was the first "discipline" he had received at NOV. But the summary-judgment evidence he cites for this "discipline" shows only that a meeting was held to review issues relating to the night shift. (Docket Entry No. 75, Exs. A, B, 15, 16). Like Williams, Lister does not point to evidence showing that this meeting was disciplinary in nature or would deter a reasonable person from engaging in protected activity. The meeting notes reflect that it would not.

Lister alleges that he was retaliated against when he asked for and was refused a pay advance on October 23, 2009. Following that request, Long sent an email to all employees, stating that requests for pay loans had become too frequent and that "[a]s of today's date NOV Sugar Land will not give any future pay advances or loans." Lister does not point to evidence that after this policy change, NOV continued offering advances to other employees or other evidence suggesting that NOV's actions were retaliatory.

Lister alleges that his employment was terminated in retaliation for his EEOC complaint. NOV has pointed to legitimate, nonretaliatory reasons for firing Lister. Lister has not identified summary judgment evidence supporting an inference that he would not have been fired but for his protected activity.

Lister asserts that NOV retaliated against him by failing to notify him or his attorney of the attempted service, then substituted service, of legal papers relating to a child-support proceeding. Lister asserts that an attempt at serving him with legal papers relating to his child-support obligations was made at NOV while he was on medical leave between July and November 2011. He asserts that substituted service was effected through Stephanie Wade on December 19, 2011, after he had been fired. Lister states that because he was not notified of the service, he did not know that a hearing was set in the child-support case. At that hearing, held without his knowledge or participation, the court entered a child-support award against him.

Lister must raise a fact dispute material to showing the but-for causal link between his EEOC charge filed on August 10, 2009 and NOV's failure to notify him of the service of process. Lister was served with summons after a Texas state-court order approved substituted service under Rule 106(b) of the Texas Rules of Civil Procedure. Under Rule 106(b), when personal service or certified mail is unsuccessful under Texas Rule 106(a), the plaintiff may move for a substituted method of service by providing an affidavit "stating the location of the defendant's usual place of business or usual place of abode or other place where the defendant can probably be found," TEX. R. CIV. P. 106(b), and stating facts "showing that service has been attempted under either (a)(1) or (a)(2) at the location named in such affidavit but has not been successful." *Id.* When substituted service was

made at the NOV plant, it was no longer Lister's usual place of business or a place where he could probably be found.[5]

There is no basis that Lister identifies in this record to find that NOV had an obligation to inform Lister as a former employee of efforts to effect service or to forward substituted service. Absent such an obligation, there is no basis in the record to infer that NOV's failure to forward the substituted service to Lister was retaliation related to his EEOC complaint.  While temporal proximity between protected activity and an adverse action may suffice for a *prima facie* case of retaliation, an approximately two or more year temporal gap does not.

Because Williams and Lister have failed to point to evidence creating fact disputes material to determining whether they were retaliated against in violation of Title VII and similar statutes, summary judgment is granted dismissing those claims.

### C.    The Hostile Work Environment Claims

#### 1.    The Legal Standard

To establish a *prima facie* case of a racially hostile work environment, the plaintiffs must show that: (1) they belong to a protected group; (2) they were subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.  *See Hernandez v. Yellow Transp., Inc*., 670 F.3d 644, 651 (5th Cir. 2012).  For harassment to be actionable, it must be "sufficiently severe or pervasive to alter

---

[5]  If, as Lister alleges, the service was effected pursuant to an affidavit that incorrectly stated the location identified as his usual place of business or where he could probably be found, the service may well have been subject to challenge.  There is no indication that Lister or his counsel in the state court attempted to do so.

the conditions of the victim's employment and create an abusive working environment." *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (internal quotation marks and citation omitted); *see also Harvill v. Westward Commc'ns LLC*, 433 F.3d 428, 434 (5th Cir. 2005) ("Whether a workplace is a hostile work environment depends on "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance."); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

In support of their hostile-work-environment claims, the plaintiffs state that they were "each surrounded by racial markings, such as the word 'NIG' scrawled on a toolbox, the word 'tribal' used by Steve Long . . . to describe black co-workers, scratched vehicles and other forms of racial intimidation." (Docket Entry No. 75 at 14). Long sent Williams an email about his alleged "sexual relations with a female employee" in his office.[6]

---

[6] The plaintiffs describe in their depositions and declarations additional events that might be used to support their hostile work environment claims. These include: (1) Williams's allegations that a white warehouse employee told another employee that Williams was an uppity person and that he would put him in chains and drag him down the street; (2) Williams's allegation that a fired white former coworker went to the guard gate with a shotgun and threatened to "get" Williams; and (3) Lister's allegation that Long told him "to walk with [his] White supervisor and not with [his] Black supervisor . . . because Black supervisors 'act like they own the company.'" The plaintiffs do not point to any of these events in their brief opposing summary judgment. They purport to incorporate into their briefs the entire declarations they attached as evidence in opposition to summary judgment. Federal Rule of Civil Procedure 56(c)(1) provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including . . . affidavits or declarations." Rule 56(c)(3) states that "[t]he court need consider only the cited materials, but it may consider other materials in the record." The plaintiffs cannot circumvent their obligation to point to specific facts demonstrating the existence of a genuine

The plaintiffs have failed to make a *prima facie* showing of harassment. The plaintiffs do not identify evidence in the record that they were "surrounded" by racial markings or that they knew of any incident involving racial markings other than the word "NIG" on a toolbox belonging to another employee. They do not assert that they saw the word "NIG" scrawled on a toolbox owned by this other employee. *See Hudson v. Cleco Corp.*, 2013 WL 4840491, at *4 (5th Cir. Sept. 12, 2013) (affirming summary judgment dismissing a hostile work environment claim in part because the plaintiff did not "present any evidence that he saw the noose or that its display was directed at him"); *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995) (holding that alleged statements to third-parties did not substantiate a hostile work environment claim when "there was insufficient information as to when the statements were made, how knowledge of them was acquired, and when [the plaintiff] was informed of them (if she was)"). Wilson, a former plaintiff in this suit whose claims were dismissed, complained that the word "NIGGER" had been written on his toolbox. A photograph showing the toolbox with the offensive word was given to NOV.

The plaintiffs complain that there were scratches on their cars. Neither points to evidence that there was any supervisor involved. The undisputed evidence is that when the plaintiffs complained to NOV about the scratches on their cars, NOV took appropriate remedial action by allowing them to park their cars in a new location that was secure and could be monitored. There is no evidence of any further similar incident. Williams has also failed to identify evidence, beyond

---

fact dispute by incorporating portions of the record wholesale into their already overlong brief. As the Fifth Circuit has explained, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Am. Family Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 896 (5th Cir. 2013). Additionally, even if considered, this evidence is not sufficient to support an inference of a severe and pervasive hostile work environment. And Williams does not point to evidence suggesting that the fired former coworker's hostility to him was based on his race.

his own subjective belief or speculation, that the email Long sent him warning him that he should meet with female employees behind closed office doors reflected racial stereotypes or animus.

The remaining evidence the plaintiffs identify of a hostile work environment is Long's description of Tassew, who had immigrated from Ethiopia, as "tribal." But even with this comment, the plaintiffs' allegations, considered collectively, fall short of suggesting that they were subjected to a racially hostile work environment. Courts require plaintiffs to point to evidence of abuse that is more severe and frequent than what Williams and Lister have identified here. *Compare Walker v. Thompson*, 214 F.3d 615, 619–22 (5th Cir. 2000) (holding that a hostile work environment claim survived summary judgment where evidence demonstrated years of inflammatory racial epithets, including "nigger" and "little black monkey"), *and Kang v. U. Lim. Am., Inc.*, 296 F.3d 810, 817 (9th Cir. 2002) (finding that a Korean plaintiff suffered harassment when a supervisor verbally and physically abused the plaintiff every day for nearly four years because of his race); *with Manatt v. Bank of America, NA,* 339 F.3d at 792, 799 (9th Cir. 2003) (finding no hostile work environment from coworkers' jokes that included the phrase "China Man," pulling eyes back with fingers to mock the appearance of Asians, and ridiculing the plaintiff for mispronouncing words), *and Vasquez v. Cnty. of Los Angeles*, 307 F.3d 884, 893 (9th Cir. 2002) (no hostile work environment despite supervisor yelling at the plaintiff in front of others and saying that he had "a typical Hispanic macho attitude" and that he should work in the field because "Hispanics do good in the field").

Lister's evidence that he felt compelled to take leave and consult a doctor due to work-related stress does not alter this analysis because it is not evidence of the objective offensiveness of the work environment. *See Wilkinson v. Potter*, 236 F. App'x 892, 893 (5th Cir. 2007) ("The

harassment must also be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." (internal quotation marks and citation omitted)).

Because the plaintiffs have not shown that there is a genuine fact dispute material to determining whether they were subject to severe or pervasive harassment that affected the terms and conditions of their employment, summary judgment is granted on their hostile work environment claims.[7]

### D.    The FMLA Claims

### 1.    The Legal Standards

The FMLA gives eligible employees 12 weeks of unpaid leave per year under specified circumstances. 29 U.S.C. § 2612(a)(1); *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008). The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided," 29 U.S.C. § 2615(a)(1), including the right to reinstatement upon return from leave, 29 U.S.C. § 2614(a)(1).

---

[7] NOV also asserts an affirmative defense under *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). Those cases provide that an employer may have an affirmative defense to a claim of vicarious liability for sexual harassment carried out by a supervisor with authority over the employee. To establish a *Ellerth* and *Faragher* defense, the employer must show that (1) the employer exercised reasonable care to prevent and correct promptly any sexual harassment, and (2) the complaining employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807. NOV contends that the plaintiffs both acknowledged receiving the policy prohibiting harassment, and that the policy made it clear that they were required to report any such harassment to NOV's Human Resources department. NOV contends that to the extent the plaintiffs did not do so, they are precluded from maintaining a harassment claim. (Docket Entry No. 69-1 at 39). Because the plaintiffs have failed to raise a fact dispute material to determining whether they were subject to a racially hostile working environment, this court need not decide whether NOV has sufficiently demonstrated that summary judgment should be granted on its *Ellerth -Faragher* defense.

"[I]nterfering with" includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b); *Bell v. Dallas Cnty.*, 432 F. App'x 330, 334 (5th Cir. 2011) (citing *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050–51 (8th Cir. 2006)). To prevail on an interference claim, an employee must show either that he was denied his entitlement under the FMLA, or that an employer did not respect his entitlement. *Bell*, 432 F. App'x at 334 (citing *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005)).

The *McDonnell Douglas* framework applies to FMLA retaliation claims. *Hunt v. Rapides, Healthcare Sys.*, 277 F.3d 757, 768 (5th Cir. 2001). A *prima facie* showing of retaliation under the FMLA requires a plaintiff to demonstrate that: "(1) he was protected under the FMLA; (2) he suffered an adverse employment action; and (3) he was treated less favorably than an employee who had not requested leave . . . or the adverse decision was made because he sought protection under the FMLA." *Grubb v. Sw. Airlines*, 296 F. App'x 383, 389 (5th Cir. 2008) (quotation marks and citations omitted).

### 2.    Lister's FMLA Interference Claims

Lister took more than the 12 weeks of leave permitted by the FMLA. Lister does not dispute that he was reinstated to his previous position at NOV after his FMLA leave or identify summary-judgment evidence that he was denied leave. Lister does not address his FMLA interference claim in his summary-judgment briefing. In his opposition to NOV's motion to dismiss, Lister asserts that "[t]he return to work but immediate termination of Lister's employ is an interference of Lister's rights under the FMLA, tantamount to a failure to return Lister to work following FMLA leave which is an actionable violation of the FMLA, 29 U.S.C. §§ 2614(a)(1), 2615(a)(1)(2)." (Docket

Entry No. 75).  This is a wrongful termination claim, but not an FMLA interference claim.  The Fifth

Circuit has held that when a plaintiff receives the leave he requests and returns to the job he left, he

has no interference claim as a matter of law.  *See De La Garza–Crooks v. AT&T*, No. 00–50969,

2001 WL 361099, at *1 (5th Cir. Mar. 22, 2001); *see also Carroll v. Sanderson Farms, Inc.*, No. H-

10-3108, 2012 WL 3866886, at *21 (S.D. Tex. Sept. 5, 2012).   Here, Lister received the FMLA

leave that he requested and subsequently was reinstated to the job he left.  Lister has not alleged or

identified evidence that he was denied his FMLA leave, that he refrained from taking it because of

his employer's or supervisor's conduct, or that he returned early from leave due to pressure by NOV.

Summary judgment is granted dismissing Lister's interference claim.

### 3.   Lister's FMLA Retaliation Claim

Lister contends that NOV retaliated against him for taking FMLA leave by terminating his

employment two weeks after he returned to work.  Lister also argues that NOV retaliated against

him for taking FMLA leave by not informing him of attempts to serve him with legal papers in

connection with a claim against him for unpaid child support.

Lister availed himself of his FMLA rights.  The record reflects that he requested and was

granted FMLA leave from September 29, 2011 until November 15, 2011.  Lister suffered an adverse

employment action when he was fired.  *Grubb v. Sw. Airlines*, 296 F. App'x 383, 390 (5th Cir.

2008).  NOV has raised a legitimate nondiscriminatory reason for firing him.  To preclude summary

judgment, Lister must identify evidence supporting an inference that, or raising factual disputes

material to determining whether, he was terminated because he took FMLA leave.  Lister has not

identified evidence rebutting NOV's articulated nondiscriminatory legitimate reason for firing him.

Lister points out that he was fired two weeks after he returned from FMLA leave.  While temporal proximity is sufficient for a *prima facie* showing of FMLA retaliation, "timing alone is not enough to support retaliation" once the employer has offered a nondiscriminatory legitimate reason for the adverse employment action.  *See Grubb v. Sw. Airlines*, 296 F. App'x 383, 390 (5th Cir. 2008) (quoting *Jarjoura v. Ericsson, Inc.*, 266 F. Supp. 2d 519, 531 (S.D. Tex. 2003), *aff'd*, 82 F. App'x 998 (5th Cir. 2003) (unpublished)).

Lister also claims that NOV retaliated against him for taking FMLA leave, because during his 16-plus week medical leave, NOV did not notify him that a process server unsuccessfully attempted to serve him with process at NOV's plant.  He similarly claims retaliation on the ground that NOV did not notify him that a process server returned and left papers for substituted service after Lister had been fired.

 Although the causal standard for a retaliation claim under the FMLA could be broader than the standard under Title VII, *see Ion v. Chevron USA, Inc.*, No. 12-60682, — F.3d —, 2013 WL 5379377 (5th Cir. Sept. 26, 2013), that does not affect the outcome here.  As explained above in analyzing Lister's claim that NOV's failure to advise him about the process server was in retaliation for the EEOC complaint he had filed, the FMLA retaliation claim cannot proceed.  There is temporal proximity, but no basis to find that NOV had an obligation to notify Lister, a former employee, of substituted service.  Lister does not identify summary-judgment evidence that raises a genuine factual dispute material to determining that retaliation for FMLA leave caused NOV to decide not to forward the summons.

**V.      Conclusion**

The defendant's motion for summary judgment is granted as to the plaintiffs' discrimination, harassment, and retaliation claims under Title VII, § 1981, and Texas law, and as to Lister's FMLA interference and retaliation claims.  Final judgment is separately entered.

SIGNED on September 30, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

56